* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Phillips and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and upon reconsideration, the Full Commission reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are subject to and bound by the provisions of the North Carolina Worker's Compensation Act.
2. All parties have been correctly designated and there is no question as to misjoinder or non-joinder of the parties.
3. An employer-employee relationship existed between plaintiff and defendant-employer at the time of plaintiff's alleged contraction of an occupational disease or injuries by accident.
4. Plaintiff's average weekly wage is $1,389.98, which yields the maximum compensation rate for 2003 of $674.00.
5. The parties stipulated at the arguments before the Full Commission that plaintiff returned to work full time on October 1, 2004 earning diminished wages for which he may be entitled to temporary partial disability compensation at the rate of $548.00 per week, if the claim is found compensable.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing, plaintiff was 40 years old. He served in the United States Army from 1981 until January 1989 as a tank crewman, and later, he attended Robeson Community College. In the early 1990's, plaintiff began work as a welder.
2. In September 2002, plaintiff began working for defendant-employer as a welder on the Belew's Creek power plant job site in Greensboro. The job was to last approximately two years and, as part of plaintiff's compensation package, plaintiff was paid per diem of at least $50.00. Plaintiff's pay stubs for the period of September 2, 2002 until his last date of employment on February 5, 2003, show per diem earnings of $6,900.00 and wage and bonus earnings of $24,068.75, for a total of $30,968.75.
3. Plaintiff initially worked as a welder outside in the lay down yard, about one mile away from the plant. Plaintiff had no problem with his sinuses, vocal cords, or breathing while working outside. After approximately two months, plaintiff began work in the boiler house of the old plant, reinforcing steel beams by welding and fitting them with steel cladding. The environmental conditions inside the boiler house were dusty with gray fly ash. Plaintiff described the fly ash as up to 12 inches thick and that when he walked through the ash, it became airborne and created a lot of dust. In the boiler house, plaintiff either welded through the fly ash residue with his electric stick welder or burned through it with his acetylene torch. When burning through the caked on fly ash, plaintiff noticed a prevalent sweet acidic smell and felt his eyes, nose, and throat burn.
4. Between mid-January and the end of January 2003, plaintiff was exposed to fly ash on approximately 10 occasions that occurred while he worked in the boiler house. Prior to these exposures, plaintiff had no problems with his throat or vocal cords and he never had any asthma-like symptoms. Plaintiff explained that these exposures to fly ash were different from when he welded steel.
5. On January 17 and 31, 2003, plaintiff saw his family physician, Dr. Joseph E. Roberts, and complained of problems with his sinuses, throat, and coughing that he stated began as a result of his fly ash exposure. Plaintiff provided defendant-employer with doctor's notes for these visits.
6. At the end of January or early February 2003, plaintiff requested to work outside in the lay down yard, refusing to work in the boiler house around the fly ash. On February 2 and 5, 2003, plaintiff met with defendant-employer's management on the job site and scussed the fly ash exposure, requested a respirator, and expressed his desire to work outside in a cleaner environment. At both meetings, defendant-employer told plaintiff he would be terminated due to excessive absenteeism and, on February 5, 2003, plaintiff was escorted to the entrance gate, his job site badge was taken and his tools were cleared out. Plaintiff later received a COBRA notice stating that he was terminated. Some time later, plaintiff received another notice that stated he was on workers' compensation leave of absence. Plaintiff did not work for defendant-employer after February 5, 2003.
7. On February 6, 2003, plaintiff provided human resources manager David Camack a doctor's note stating that he required a respirator at work. Plaintiff attempted to call Mr. Camak on several occasions, but he never spoke directly to Mr. Camak. From February 6, 2003 through August 2003, plaintiff did not work.
8. Plaintiff continued to seek medical treatment from Dr. Roberts. Dr. Roberts noted that plaintiff complained of a runny nose, nasal congestion, cough, and a sore throat as a result of his fly ash exposure. Dr. Roberts referred plaintiff to an ear, nose, and throat specialist, Dr. Edward B. Ermini. On April 2, 2003, Dr. Ermini noted that plaintiff suffered from severe sore throat, nasal congestion, and voice problems after exposure to unknown chemicals at work. Dr. Ermini found that plaintiff's nose had red, inflamed mucosa, his nasopharynx was mildly inflamed, and his vocal cords were red and inflamed bilaterally. There is no medical evidence in the record that plaintiff's vocal cords, nose, nasal passages, or mucosal lining were permanently injured. Dr. Ermini prescribed Singulair and Zyrtec for plaintiff's condition.
9. On March 4, 2003, plaintiff saw Dr. Irlene Locklear, a board certified pulmonary physician since 1999. Plaintiff presented with symptoms of coughing up blood, sore throat, nosebleeds, and shortness of breath, stating that the symptoms began in January 2003 when he inhaled particles at work while replacing old steel. Plaintiff felt that his symptoms had improved since he stopped working in February 2003. Dr. Locklear compared plaintiff's normal pre-employment pulmonary function test from February 7, 2002, to his abnormal post-employment pulmonary function test performed on March 4, 2003 at another facility. On the March 4, 2003 test, plaintiff only gave two tries instead of the usual three and only blew for five and a half seconds instead of six seconds. Based on the results of the two tests, Dr. Locklear determined that there was a tremendous change in plaintiff's lung function and that he had a severe restrictive lung defect. On March 14, 2003, Dr. Locklear ordered a full pulmonary function test, as well as a CT scan, which were both normal. Dr. Locklear thought that it was possible that plaintiff's March 4, 2003 test was not thorough or that the machine was not calibrated properly, which may have caused the disparity in results.
10. Dr. Locklear ordered a methacholine challenge test which was done on November 25, 2003. Based on the positive methacholine challenge test, Dr. Locklear ultimately diagnosed plaintiff with mild asthma, a hyper-reactive airways disease, which is a permanent condition. On December 18, 2003, Dr. Locklear prescribed plaintiff a metered-dose inhaler and other medications for his asthma.
11. At her deposition, Dr. Locklear testified that plaintiff's symptoms were consistent with exposure to fly ash, yet she was not sure what fly ash was and did not know how much exposure was needed to develop asthma or cause permanent damage. Dr. Locklear then testified that plaintiff's workplace exposure to fly ash was a significant contributing factor in the development of his lung condition. Dr. Locklear also reviewed the fly ash Material Safety Data Sheet and stated that plaintiff's exposure to fly ash placed him at an increased risk of developing his lung condition compared with the general population. Dr. Locklear explained, however, that it was more likely that plaintiff's exposure to fly ash could have caused pre-existing asthma to flare up, and she could not say that plaintiff's exposure to fly ash at work actually caused the development of his asthma. Dr. Locklear felt that although plaintiff did not sustain any permanent lung damage and was not disabled from working, he should avoid triggers that could cause a flare-up of his asthma, such as his job with defendant-employer.
12. Beginning on March 10, 2003, plaintiff sought counseling from Jeffrey Campbell, MSW, LCSW, for stress, headaches, and difficulty sleeping. Plaintiff was ultimately diagnosed with an adjustment disorder with depressed mood. On March 19, 2003, Mr. Campbell referred plaintiff to Dr. David Amsellem, a psychiatrist, for medication to control sleeping problems and irritable mood, and Dr. Amsellem kept plaintiff out of work through June 1, 2003, as a result of his psychological condition. At his deposition, Mr. Campbell testified that incidents at work in February 2003 and plaintiff's concern over his health and the resulting inability to provide for his family were significant contributing factors to the development of plaintiff's adjustment disorder and his symptoms.
13. On August 11, 2004, plaintiff saw Dr. Andrew Ghio for an independent medical evaluation. Dr. Ghio has been board certified in internal medicine since 1984 and in pulmonary medicine since 1990, and is a former chairman of the Industrial Commission's Advisory Medical Committee. Dr. Ghio previously worked for the Centers for Disease Control in the division of respiratory disease studies, after which he completed training in pulmonary medicine and began work on the faculty at Duke University. Dr. Ghio is currently employed with the Environmental Protection Agency pursuing research in particle fibers. Dr. Ghio is familiar with fly ash and has conducted laboratory studies that use fly ash to determine the biological effects of air pollution particles. Dr. Ghio testified that he uses coal fly ash as a control in his studies, as it is a particle with very little biological activity.
14. Upon review of plaintiff's medical records, Dr. Ghio stated that plaintiff had no evidence of any lung injury following the fly ash exposure, but that he may have asthma. After performing a physical examination, Dr. Ghio testified that plaintiff might have had some irritation of mucus membranes, but that he did not have a chronic injury. Regarding plaintiff's positive methacholine challenge test, Dr. Ghio explained that to have a positive test result, there must be a drop of 20 percent within the first three doses. Plaintiff did not have a 20 percent drop until the fifth dose. Dr. Ghio testified that even a normal individual responds to a methacholine challenge test on the fifth dose, and thus, plaintiff's methacholine challenge test was normal. Additionally, Dr. Ghio testified that plaintiff's fly ash exposure had no bearing on his complaints of shortness of breath and that "an exposure to a [fly ash] particle has never, ever in the history of all medical investigation been associated with a fibrotic injury to the larynx." Dr. Ghio explained that plaintiff's description of the duration of his exposure to fly ash did not meet Dr. Ghio's definition for a prolonged exposure sufficient to cause plaintiff's symptoms. Dr. Ghio stated that plaintiff's asthma and other respiratory conditions were not caused by his exposure to fly ash, although exposure to fly ash can exacerbate asthma in an individual who already has it. Dr. Ghio further stated that plaintiff did not have any permanent partial disability.
15. The Full Commission gives greater weight to the testimony and expert opinions of Dr. Ghio than to the testimony of Dr. Locklear, based upon Dr. Ghio's greater level of expertise and his extensive research and clinical experience with fly ash.
16. After plaintiff's physicians released him to return to work in August 2003, he found work as a boilermaker on a construction site for Atlantic Group, a nuclear power plant in South Carolina. Plaintiff earned more with Atlantic Group than he did while working for defendant-employer, in part due to per diem he received. Plaintiff attempted this job, but stated that he was unable to keep up with his co-workers due to his breathing difficulties. On October 21, 2003, plaintiff was terminated for unacceptable job performance.
17. As of September 16, 2004, the date of the Deputy Commissioner's hearing, plaintiff was not employed. Since October 21, 2003, plaintiff made approximately 30 contacts while looking for work but was not offered a job at his prior wage-earning capacity that he could perform. On October 1, 2004, plaintiff obtained full-time employment at reduced wages.
18. While the medical evidence shows that plaintiff's job may have placed him at an increased risk of aggravating a pre-existing asthmatic condition, plaintiff's asthma was not caused by his exposure to fly ash during his employment with defendant-employer. The greater weight of the medical evidence fails to show that plaintiff's asthma was characteristic of or peculiar to his employment or that plaintiff's job placed him at an increased risk of contracting or developing asthma than the general public not so employed.
19. The greater weight of the evidence fails to show that plaintiff's fly ash exposure between mid-January and the end of January 2003 constitutes an injury by accident arising out of and in the course of his employment with defendant-employer.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In order to establish an occupational disease under N.C. Gen. Stat. § 97-53(13), plaintiff must show that the employment exposed him to a greater risk of contracting the disease than the public generally. Rutledge v. Tultex Corp., 308 N.C. 85,301 S.E.2d 359 (1983). In addition, the plaintiff must show that the employment significantly contributed to, or was a significant causal factor in, the development of the disease. Hardin v.Motor Panels, Inc., 136 N.C. App. 351, 524 S.E.2d 368, disc.rev. denied, 351 N.C. 473, 543 S.E.2d 488 (2000). Where the condition was aggravated but not originally caused by the plaintiff's employment, the plaintiff must show that the employment placed him at a greater risk for contracting or developing the condition. Futrell v. Resinall Corp.,151 N.C.App. 456, 566 S.E.2d 181 (2002), aff'd per curiam,357 N.C. 158, 579 S.E.2d 269 (2003); Norris v. Drexel HeritageFurnishings, Inc., 139 N.C.App. 620, 534 S.E.2d 259 (2000),cert. denied, 353 N.C. 378, 547 S.E.2d 15 (2001).
2. In the present case, plaintiff's employment may have aggravated a pre-existing asthmatic condition. However, the greater weight of the medical evidence fails to show that his employment with defendant-employer placed plaintiff at an increased risk of contracting or developing asthma because of his exposure to fly ash during his employment with defendant-employer, as compared to the general public not so employed. See, Futrell v. Resinall Corp., supra; Norris v.Drexel Heritage Furnishings, Inc., supra. Accordingly, plaintiff has failed to establish that he contracted an occupational disease within the meaning of N.C. Gen. Stat. § 97-53(13).
3. Plaintiff did not sustain an injury by accident arising out of and in the course of his employment with defendant-employer when he was exposed to fly ash between mid-January and the end of January 2003. N.C. Gen. Stat. § 97-2(6).
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for compensation under the North Carolina Workers' Compensation Act must be, and the same is hereby, DENIED.
2. Each side shall bear its own costs.
This 26th day of January 2006.
 S/ _______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/ _______________________ BERNADINE S. BALLANCE COMMISSIONER
 S/ _______________________ DIANNE C. SELLERS COMMISSIONER